UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x

JAMES BERTONIS, Individually and on                 :    Civil Action No.
Behalf of All Others Similarly Situated,            :
                                                    :    <u>CLASS ACTION</u>
                          Plaintiff,                :
                                                    :    CLASS ACTION COMPLAINT
            vs.                                     :
                                                    :
BANK OF AMERICA CORPORATION and                     :
MERRILL LYNCH, PIERCE, FENNER &                     :
SMITH INCORPORATED,                                 :
                                                    :
                          Defendants.               :
                                                    :    <u>DEMAND FOR JURY TRIAL</u>
------------------------------------------------------ x

By and through his undersigned counsel, James Bertonis ("Plaintiff") brings this class action against defendant Bank of America Corporation ("BofA") and its wholly owned subsidiary, defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) documents created and distributed by Defendants; (b) public filings made by BofA with the U.S. Securities and Exchange Commission ("SEC"); (c) press releases disseminated by Defendants; and (d) news articles, websites, and other publicly available information concerning Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      Plaintiff brings this class action to recover damages arising out of Defendants' unlawful conduct related to their Sweep Programs (defined below). Under the Sweep Programs, Defendants swept idle customer cash into interest-bearing accounts at banks selected by and affiliated with Defendants.

2.      The cash sweep accounts were highly lucrative for Defendants and their banks but paid unreasonably low, below-market interest rates to customers. As such, Defendants used the Sweep Programs to generate massive revenue for themselves at the expense of their customers.

3.      Defendants' use of the Sweep Programs to enrich themselves by paying unreasonably low interest rates to customers breached their fiduciary duties and contractual obligations and violated several state and federal laws including the Racketeer Influenced and Corrupt Organizations Act ("RICO Statute") and the Investment Advisers Act of 1940 ("Advisers Act").

- 1 -

4.    Indeed, on January 17, 2025, the SEC announced that it had charged Merrill with "willfully" violating the Advisers Act in connection with the Sweep Programs.  The SEC found that Merrill "swept billions of dollars in client cash into its [Sweep] Program annually," "earned advisory fees on [Sweep] Program assets," and "was credited with revenue from affiliated banking entities based in part on the spread earned by banking affiliates on the [Sweep] Program."  Despite these "significant financial benefits" to Merrill and its banking affiliates, "the yields advisory clients received from the [Sweep] Program were often significantly lower than the yields clients could have received had Merrill Lynch made other options available as part of the cash Sweep Programs."

5.    As a result, the SEC determined that Merrill failed to adopt and implement policies and procedures to consider their clients' best interest when evaluating potential sweep options for cash held in advisory accounts and to ensure that cash held in an advisory account is properly managed by financial advisers consistent with a client's investment profile.  Merrill agreed to pay a civil penalty of $25 million to settle the charges and undertook remedial actions including increasing sweep interest rates paid to advisory clients.

**JURISDICTION AND VENUE**

6.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court also has subject matter jurisdiction under 18 U.S.C. §1964(c), 28 U.S.C. §1331, and 15 U.S.C. §80b-14 because Plaintiff brings claims arising under the RICO Statute, 18 U.S.C. §1962, and the Advisers Act, 15 U.S.C. §80b-1-80b-21.

7.     This Court has personal jurisdiction over Defendants because, during the relevant time period, Defendants had offices in, did sufficient business in, had sufficient contacts with, and intentionally availed themselves of the laws and markets of New York through the promotion, sale, marketing, distribution, and operation of their products and services.

8.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because, during the relevant time period, Defendants transacted business and had offices in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

9.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails and interstate telephone communications.

**PARTIES**

**Plaintiff**

10.     Plaintiff James Bertonis is a citizen of California.  During the relevant time period, Plaintiff held both a traditional brokerage account and a Roth IRA account with Merrill. Uninvested cash Plaintiff held in his accounts was swept into the banks that Defendants selected in their discretion at the unreasonably low interest rates alleged herein pursuant to the Sweep Programs.

**Defendants**

11.     Defendant Bank of America Corporation is a Delaware corporation headquartered at Bank of America Corporate Center, 100 North Tryon Street, Charlotte, North Carolina 28255. BofA is a financial services company that conducts business throughout the United States, overseeing assets totaling $3.2 trillion.  BofA is the parent company and control person of Merrill.

12.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is a Delaware corporation headquartered at One Bryant Park, New York, New York 10036.  Merrill is a broker-

dealer and a Registered Investment Advisor that offers brokerage and investment advisory services to its nationwide client base. Merrill acts as its customers' agent for the establishment, maintenance, and operation of the Sweep Programs. Merrill is a wholly owned subsidiary of, and controlled by, BofA.

## SUBSTANTIVE ALLEGATIONS

**Background on Defendants' Sweep Programs**

13.     BofA is one of the largest financial services firms in the country. BofA's wholly owned subsidiary, Merrill, operates as a wealth management division of BofA. During the relevant time period, Merrill offered brokerage and investment advisory services to customers nationwide. These services included two automatic cash sweep programs called the Merrill Lynch Bank Deposit Program ("Bank Deposit Program") and the Merrill Lynch Retirement Asset Savings Program ("RASP") (collectively, "Sweep Programs"). The Bank Deposit Program swept cash from non-retirement accounts while the RASP swept cash from retirement accounts.

14.     The terms and conditions of the Bank Deposit Program were set forth and incorporated in Merrill's Client Relationship Summary and Client Relationship Agreement[1] ("Account Agreement"), Best Interest Disclosure Statement,[2] Merrill Edge Self-Directed Investing Client Relationship Agreement[3] ("CR Agreement"), Merrill Edge Self-Directed Cash

---

[1]   Merrill, *Client Relationship Summary* (Mar. 22, 2024), https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/ClientRelationshipAgreement.pdf.

[2]   Merrill, *Best Interest Disclosure Statement* (Apr. 2024), https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/Regulation-Best-Interest-Disclosure-Statement_RBIDISC.pdf.

[3]   Merrill, *Merrill Edge Self-Directed Investing Client Relationship Agreement* (Jan. 2025), https://olui2.fs.ml.com/publish/content/application/pdf/gwmol/merrilllynchself-directedinvestingclientrelationshipagreement.pdf; Merrill, *Merrill Edge Self-Directed Investing Client Relationship Agreement* (Apr. 2024),

Management Account (CMA Account) Disclosures and Agreement,[4] CMA Financial Service Cash Management Account Disclosures and Account Agreement,[5] and Sweep Program Guide[6] (collectively, "Bank Deposit Program Documents"), which were posted on Merrill's public website.  The Bank Deposit Program Documents were governed by New York state law.

15.     The terms and conditions of the RASP were set forth and incorporated in Merrill's Account Agreement, Traditional IRA Disclosure and Custodial Agreement[7] ("Traditional IRA Agreement"), Roth Individual Retirement Account (Roth IRA) Disclosure and Custodial Agreement[8] ("Roth IRA Agreement"), Merrill Edge Self-Directed BASIC Retirement Account Application Booklet and Agreements,[9] Retirement Cash Management Account (RCMA) Financial

---

https://web.archive.org/web/20240415232453/https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/MerrillLynchSelf-DirectedInvestingClientRelationshipAgreement.pdf.

[4]     Merrill, *Merrill Edge Self-Directed Cash Management Account (CMA Account) Disclosures and Account Agreement* (Jan. 2025), https://olui2.fs.ml.com/publish/content/application/pdf/gwmol/merrilllynchself-directedcmaaccountagreement.pdf.

[5]     Merrill, *CMA Financial Service Cash Management Account* (July 2024), https://olui2.fs.ml.com/Publish/Content/application/pdf/GWMOL/CashManagementAccountCMADisclosuresandAccountAgreement.pdf.

[6]     Merrill, *Sweep Program Guide* (Nov. 2024), https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/Sweep-Program.pdf.

[7]     Merrill Lynch, *Disclosure and Custodial Agreement, Traditional IRA Disclosure Statement*, https://olui2.fs.ml.com/publish/content/application/pdf/gwmol/traditionaliracustodialagreementdisclosure.pdf (last visited Feb. 24, 2025).

[8]     Merrill Lynch, *Disclosure and Custodial Agreement, Roth Individual Retirement Account (Roth IRA) Disclosure Statement and Custodial Agreement*, https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/RothIRACustodialAgreementDisclosure.pdf (last visited Feb. 24, 2025).

[9]     Merrill, *Merrill Edge Self-Directed BASIC Retirement Account Application Booklet and Agreements*, https://olui2.fs.ml.com/Publish/Content/application/pdf/GWMOL/BASIC-account-application-agreement.pdf (last visited Feb. 24, 2025).

Services Document,[10] CR Agreement, CMA Agreement, CMA Disclosures, Disclosure Statement, and Sweep Program Guide (collectively, "RASP Documents" and, together with the Bank Deposit Program Documents, "Sweep Program Documents"), which were posted on Merrill's public website. The RASP Documents were governed by New York state law.

16.    Customers in the Sweep Programs included investment advisory clients enrolled in Merrill's "Investment Advisory Programs," who were, thus, subject to the terms and conditions of the Sweep Program Documents.[11]

17.    Under the Sweep Programs, Merrill automatically swept eligible clients' uninvested cash balances into interest bearing deposit accounts ("Deposit Accounts") at one or more of the following banks that are wholly-owned subsidiaries of BofA and affiliates of Merrill: Bank of America, N.A. ("BANA"), Bank of America California, N.A. ("BA-CA"), and Merrill Lynch Bank and Trust Company (Cayman) Limited (collectively, "Merrill Affiliated Banks" or "Bank Affiliates").

18.    The Sweep Program Documents provided that Merrill acted as agent for customers in the Sweep Programs, stating: "In the United States, Merrill acts as a broker (i.e., agent) for its

---

[10]    Merrill, *Retirement Cash Management Account (RCMA) Financial Service Documents*, https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/RCMA-account-agreement-program-description-MESD.pdf (last visited Feb. 24, 2025).

[11]    *See, e.g.*, Merrill, *Client Relationship Summary*, *supra* note 1 at 2, 5, 13; Merrill, *Sweep Program Guide*, *supra* note 6 at 4-5; Merrill, *CMA Financial Service Cash Management Account*, *supra* note 5 at 3-4, 13; *see also In the Matter of Merrill Lynch, Pierce, Fenner & Smith Incorporated*, Investment Advisers Act of 1940, Release No. 6829, Administrative Proceeding, File No. 3-22433, Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 and Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sections and a Cease-and-Desist Order (SEC Jan. 17, 2025), https://www.sec.gov/files/litigation/admin/2025/ia-6829.pdf ("SEC Cease-and-Desist Order") at ¶2 ("From January 2022 through April 2024 . . . [the Bank Deposit Program] was the only cash sweep option for most advisory clients at Merrill Lynch.").

private clients as well as its corporate and institutional clients. . . . . Through BANA, and other bank Affiliates (Bank Affiliates), Merrill provides access to banking services, including lending and cash sweep services."[12]  Similarly, the Sweep Program Documents stated that "Merrill Lynch is acting as agent and messenger for its customers for the deposits at BANA and/or BA-CA"[13] and "[c]ertain conditions must be satisfied for deposit insurance coverage to apply when bank deposits are opened on your behalf in the name of Merrill as your agent.  Merrill has in place business requirements and practices that are reasonably designed to satisfy those conditions, which include, but are not limited to, proper account titling and recordkeeping."[14]

19.    The Sweep Program Documents further stated that the Deposit Accounts in the Sweep Programs "will bear a rate of interest that has been established for, and in light of the features of, the Sweep Programs.  The rate of interest for such deposit accounts is periodically set and reset by the Merrill Affiliated Banks in their discretion."[15]  Merrill had input on the interest rates established by the Merrill Affiliated Banks.[16]

**Defendants Reaped Significant Benefits from the Sweep Programs to the Detriment of Their Customers, Who Were Paid Unreasonably Low Interest Rates**

20.    The Sweep Programs provided several highly lucrative financial benefits to Defendants and their Bank Affiliates.  First, "Merrill and [its] Bank Affiliates benefit financially

---

[12]    Merrill, *Client Relationship Summary*, *supra* note 1; Merrill, *Best Interest Disclosure Statement*, *supra* note 2.

[13]    *Merrill, CMA Financial Service Cash Management Account*, *supra* note 5.

[14]    Merrill, *Merrill Edge Self-Directed Cash Management Account (CMA Account) Disclosures and Account Agreement*, *supra* note 4 at 2-3; Merrill, *Merrill Edge Self-Directed Investing Client Relationship Agreement* (Jan. 2025), *supra* note 3 at 4.

[15]    Merrill, *Sweep Program Guide*, *supra* note 6.

[16]    SEC Cease-and-Desist Order, *supra* note 11 at ¶2.

when [customers] hold any cash balances in the bank deposit accounts affiliated with the Cash Sweep Program.  Merrill receives payments from [its] Bank Affiliates on a per account basis for each account that sweeps to one of [its] Bank Affiliates relating to offering and supporting the Cash Sweep Program."[17]

21.    Second, "Merrill Advisors and [Merrill Financial Solutions Advisors] receive increased compensation based on achieving a number of strategic objectives, including, among other activities, the growth in their clients' participation in bank sweep deposits and sweep money market funds, checking and savings accounts, the Preferred deposit product, loans, mortgages and margin lending."[18]

22.    Third, through deposits in the Sweep Programs, Merrill's Bank Affiliates "receive a stable, cost-effective source of funding.  They use these bank deposits to fund current and new lending, investment and other business activities.  The participation of the Bank Affiliates in the Cash Sweep Program increases their respective deposits and accordingly overall profits."[19]

23.    Moreover, Defendants were able to maximize their financial gain and their Bank Affiliates' financial gain from the Sweep Programs by paying customers unreasonably low rates, creating an admitted "conflict of interest" with customers:

> Bank profitability is determined, in large part, by the "spread" [the Bank Affiliates] earn on the deposits – the difference between the interest paid on the bank deposits and other amounts paid to Merrill related to these deposits, on the one hand, and the interest or other income earned on loans, investments and other assets which may be funded in part by bank deposits, on the other hand.  The greater the amount of cash balances maintained in your accounts (which could be as a result of a recommendation from your financial advisor) that is swept into a bank deposit

---

[17]    Merrill, *Best Interest Disclosure Statement*, *supra* note 2.

[18]    *Id.*

[19]    *Id.*

account affiliated with the Cash Sweep Program and *the lower the interest rate paid on the related bank deposit, the more our Bank Affiliates benefit*.[20]

24.    Similarly, the RASP Documents disclosed:

There are ***conflicts of interest*** relating to the Sweep Program . . . . If you hold cash balances in your account, both Merrill Lynch and the Merrill Lynch Affiliated Banks benefit financially when your cash is "swept" to and held in deposit with them under the Sweep Program. Merrill Lynch receives compensation from the Merrill Lynch Affiliated Banks for its services relating to the Sweep Program.[21]

25.    In particular, Merrill Lynch directly received "[u]p to $100 per year from BANA and/or BA-CA for each account that sweeps to" the Bank Deposit Program and "[u]p to $85 per year for each account that sweeps to" the RASP; Merrill Lynch "[f]inancial advisors are compensated based on their clients' total deposits held in Merrill Lynch Affiliated Banks" and "can receive a compensation award based on achieving a number of strategic objectives, including, among other activities, the growth in their clients' balances in bank sweep deposit accounts and sweep money market funds," creating "a conflict of interest"; and the Merrill Lynch Affiliated Banks "benefit financially from their use of the deposits," as follows:

Through the Sweep Program, they receive a stable, cost-effective source of funding. They use bank deposits to fund current and new lending, investment and other business activities. Their participation in the Sweep Program increases their respective deposits and overall profits. Bank profitability is determined in large part by the "spread" they earn on the deposits - the difference between the interest paid and other costs incurred by them on bank deposits (including payments to Merrill Lynch), on the one hand, and the interest or other income earned on their

---

[20] *Id.*; *see also* Merrill, *Merrill Edge Self-Directed Investing Client Relationship Agreement* (Jan. 2025), *supra* note 3 at 6. The SEC also recognizes that "cash sweep programs" are a "common source[] of conflicts of interest." U.S. Securities and Exchange Commission, Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest (Aug. 3, 2022), https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

[21] Merrill Lynch, *Disclosure and Custodial Agreement*, *Traditional IRA Disclosure Statement*, *supra* note 7 at 38-39 Merrill Lynch, *Disclosure and Custodial Agreement*, *Roth Individual Retirement Account (Roth IRA) Disclosure Statement and Custodial Agreement*, *supra* note 8 at 35-36; Merrill, *Merrill Edge Self-Directed Investing Client Relationship Agreement* (Jan. 2025), *supra* note 3 at 5-6.

loans, investments and other assets, which may be funded in part by bank deposits, on the other hand. The greater the amount of cash balances maintained in deposit accounts with the Merrill Lynch Affiliated Banks (which could be as a result of a recommendation from your financial advisor) and ***the lower the interest rate paid on the related bank deposit, the more the Merrill Lynch Affiliated Banks benefit***.[22]

26.     Due to these adverse financial incentives, Defendants failed to negotiate and secure reasonable sweep interest rates for customers in the Sweep Programs.  As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

27.     The United States Department of Labor defines a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[23]

28.     Similarly, the United States Internal Revenue Service defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."[24]  Thus, an interest rate is reasonable if it is based on a fair market valuation.

---

[22]   Merrill Lynch, *Traditional IRA Disclosure Statement*, *supra* note 7 at 38-39; Merrill Lynch, *Roth Individual Retirement Account (Roth IRA)*, *supra* note 8 at 35-36; *see also* Merrill, *Merrill Edge Self-Directed Investing Client Relationship Agreement* (Jan. 2025), *supra* note 3 at 5-6.

[23]   Grant of Individual Exemptions; Deutsche Bank AG, 68 Fed. Reg. 34646 (June 10, 2003).

[24]   26 C.F.R. §1.482-2(a)(2).

29.     In contrast, the Sweep Programs paid miniscule, below-market interest rates as low as 0.01% depending on the amount deposited.[25]   These rates were **significantly** below several objective benchmarks of reasonableness:

- **Competitors' Deposit Accounts**.  Defendants' sweep interest rates were far below fair market value, as demonstrated by the rates paid by their competitors. According to the FDIC, the national rate of interest paid by money market deposit products offered by insured depository institutions and credit unions currently averages 0.66%.[26]   Moreover, competitors offering FDIC-insured sweep accounts similar to those in the Sweep Programs pay even higher rates.   For example, competitor Moomoo's rate currently is 4.1%,[27]  Webull's rate is 3.75%,[28]

---

[25]  Merrill,  *Cash    Management    Solutions*  (Feb.   24,   2025), https://olui2.fs.ml.com/Publish/Content/application/pdf/GWMOL/ICCRateSheet.pdf.   Merrill assigned account tiers to customers of the Sweep Programs based on the amounts they deposited. *Id.*  The current annual percentage yields are 0.01% for Tiers 1-2 (<$1M), 0.05% for Tier 3 ($1M to <$10M), 0.15% for Tier 4 (>=$10M), and 4.20% for Tier 5 (limited to certain eligible retirement plan and investment advisory accounts).  *Id.*  Merrill Lynch added Tier 5 during the first half of 2024, likely due to SEC scrutiny discussed below.  Prior to the addition of Tier 5, the annual percentage yields were 0.01% for Tiers 1-2 (<$1M), 0.30% for Tier 3 ($1M to <$10M), and 1.06% for Tier 4 (>=$10M).  *See* Merrill, *Cash Management Solutions* (Mar. 22, 2024), https://web.archive.org/web/20240324180205/https://olui2.fs.ml.com/Publish/Content/applicatio n/pdf/GWMOL/ICCRateSheet.pdf.

[26]  Federal Deposit Insurance Corporation, *National Rates and Rate Caps* (Feb. 18, 2025), https://www.fdic.gov/national-rates-and-rate-caps.  The FDIC defines the national rate of interest as "the average of rates paid by all insured depository institutions and credit unions for which data is available, with rates weighted by each institution's share of domestic deposits."  *Id.*  Informa Research Services, a company that specializes in compiling business data, also found that FDIC-insured United States banks consistently pay significantly higher interest rates than Defendants on deposit accounts, including average rates ranging from 0.19% to 0.36% from August 2017 through March 2019.

[27]  Moomoo    Financial    Inc.,    *Boost    your    uninvested    cash    with    4.1%    APY*, https://www.moomoo.com/us/invest/cashsweep (last visited Feb. 24, 2025).

[28]  Webull, *Webull High-Yield Case Management*, https://www.webull.com/cash-management (last visited Feb. 24, 2025).

Vanguard's rate is 3.65%,[29] and Robert W. Baird's rate is between 1.45% and 2.89%.[30]

- **Defendants' Other Interest-Bearing Accounts**.  Further, the sweep interest rates paid by the Sweep Programs were far lower than the interest rates paid by other products offered by Defendants outside of the Sweep Programs.  For example, Defendants' Insured Savings Account paid a rate of 2.59% and Defendants' Preferred Deposit account paid a rate of 3.67%.[31]

- **Federal Funds Rate**.  The sweep interest rates in the Sweep Programs were also far below the U.S. Federal Reserve's benchmark federal funds rate, currently at 4.25% to 4.50%.[32]

- **Treasury Bill Rates**.  The sweep interest rates in the Sweep Programs were far below U.S. Treasury bill rates, including the three-month and one-year rates currently at 4.21% and 4.02%, respectively.[33]

- **Repurchase Rate**.  The sweep interest rates in the Sweep Programs were well below the overnight interest rate at which the U.S. Federal Reserve repurchases securities from private banks (*i.e.*, the repo rate), which is currently 4.25%.[34]

30.    These benchmarks individually and collectively demonstrated that the Sweep Programs' interest rates were unreasonable.  As a result, Plaintiff and the Class (defined below)

---

[29]  Vanguard, *Earn 3.65% APY with the Vanguard Cash Plus Account*, https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last visited Feb. 24, 2025).

[30]  Baird, *Cash Sweep Programs*, https://www.rwbaird.com/cashsweeps/ (last visited Feb. 24, 2025).

[31]  Merrill, *Cash Management Solutions* (Feb. 24, 2025), *supra* note 25.

[32]  Federal Reserve, *Economy at a Glance – Policy Rate* (Dec. 19, 2024), https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm.

[33]  Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis* (Feb. 21, 2025), https://fred.stlouisfed.org/series/DTB3; Federal Reserve Bank of St. Louis, *1-Year Treasury Bill Secondary Market Rate, Discount Basis* (Feb. 21, 2025), https://fred.stlouisfed.org/series/DTB1YR.

[34]  Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate: Treasury Securities Sold by the Federal Reserve in the Temporary Open Market Operations* (Feb. 21, 2025), https://fred.stlouisfed.org/series/RRPONTSYAWARD.

suffered damages by receiving far lower interest payments than they would have received if the Sweep Programs interest rates were reasonable.

**Defendants Breached Their Contractual Obligations and Fiduciary Duties Related to the Sweep Programs**

31.     Under the Sweep Program Documents, Merrill agreed to act as its customers' agent in connection with the Sweep Programs.  As agent, Merrill exercised discretion and control over cash deposited into the Sweep Programs, selected the Merrill Affiliated Banks, coordinated with the Merrill Affiliated Banks to set interest rates, and swept customers' cash into the Merrill Affiliated Banks.

32.     Merrill, as agent under the Sweep Program Documents, was contractually obligated to act in its customers' best interests in seeking and negotiating reasonable interest rates under the Sweep Programs.  In other words, reasonableness was implicit in the Sweep Program Documents and governed the sweep interest rates paid to customers in the Sweep Programs.

33.     Moreover, the CR Agreement specifically obligated Merrill to provide reasonable interest rates on cash held by their retirement account customers in the RASP: "The interest paid on retirement account assets ***will be at no less than a reasonable rate***."[35]

34.     Defendants violated these contractual duties by failing to pay reasonable sweep interest rates in both the Bank Deposit Program and the RASP, as discussed above.

35.     Defendants also violated their contractual duties to provide reasonable rates of return on RASP customers' retirement account balances pursuant to the Internal Revenue Code ("IRC") and Employee Retirement Income Security Act of 1974 ("ERISA"), which were

---

[35]  Merrill, *Merrill Edge Self-Directed Investing Client Relationship Agreement* (Apr. 2024), *supra* note 3 at 6.  Defendants removed this language from the CR Agreement sometime after April 2024.

incorporated into the RASP Documents.  For example, the Merrill Traditional IRA Agreement stated:  "As a non-bank custodian, we have been approved by the Internal Revenue Service (IRS) to administer your IRA, consistent with Section 408(a) of the [IRC].  IRS Publications 590-A and 590-B (or replacement publications) contains helpful information about your IRA and related tax topics.  Visit irs.gov online or contact any IRS to request a copy."[36]

36.    Similarly, the Merrill Roth IRA Agreement stated that Merrill Lynch is "acting as a fiduciary under Title I of [ERISA] and Section 4975 of the [IRC] (Section 4975) in its capacity as a broker-dealer when it provides investment advice and makes recommendations to you regarding securities or investment strategies in your Roth IRA," and, "[f]or more information about taxes and your Roth IRA, you should obtain a copy of IRS Publication 590-A, Contributions to Individual Retirement Arrangements (IRAs) and 590-B, Distributions from Individual Retirement Arrangements (IRAs), or replacement publications."[37]

37.    Summarizing IRC rules concerning IRAs, IRS Publication 590 states that "disqualified persons include your fiduciary," such as anyone who "[e]xercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of its assets," and that "prohibited transactions" are "any improper use of your traditional IRA account or annuity by you, your beneficiary, or any disqualified person."[38]

---

[36]    Merrill Lynch, *Disclosure and Custodial Agreement, Traditional IRA Disclosure Statement*, *supra* note 7 at 2-3; Merrill Lynch, *Roth Individual Retirement Account (Roth IRA)*, *supra* note 8 at 35-36.

[37]    Merrill Lynch, *Disclosure and Custodial Agreement, Roth Individual Retirement Account (Roth IRA)*, *supra* note 8 at 9, 16.

[38]    Department of the Treasury, Internal Revenue Service, *Distributions from Individual Retirement Arrangements (IRAs)*, Publication 590-B (Mar. 12, 2024), https://www.irs.gov/pub/irs-pdf/p590b.pdf.

38.    Section 4975 of the IRC states that "prohibited transaction[s]" involving a retirement plan include any direct or indirect "transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan"; "act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account"; or "receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan."[39]  A "disqualified person" under Section 4975 of the IRC includes a "fiduciary" and "a person providing services to the [retirement] plan."[40]

39.    Therefore, Merrill was a "disqualified person" under Section 4975 of the IRC because it was a fiduciary and service provider of retirement account customers in connection with the RASP.  Because it was a disqualified persons, cash sweeps from retirement accounts to the Merrill Affiliated Banks, for the benefit of Defendants and the Merrill Affiliated Banks, were "prohibited transactions" under Section 4975 of the IRC.

40.    The IRC provides limited "exemptions" to prohibited transactions under Section 4975, including "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution."[41]  However, cash sweeps under the RASP

---

[39]    26 U.S.C. §4975(c)(1)(D)-(F).

[40]    26 U.S.C. §4975(e)(2)(A)-(B).

[41]    26 U.S.C. §4975(d)(4).  Department of the Treasury regulations confirm that, under the IRC, investing retirement plan assets in deposits in a disqualified bank is exempted only if the deposits "bear[] a reasonable rate of interest" and, "in the case of a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization must name the institution and "state that [it] . . . may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)."  26 C.F.R. §54.4975-6(b)(1), (3).

were not exempt because the Merrill Affiliated Banks did not pay reasonable sweep interest rates, as discussed above.

41.     Similarly, Section 408 of ERISA exempts interested party transactions involving the investment of retirement account assets in bank deposits only if they "bear a reasonable interest rate." [42] This exemption did not apply because the Merrill Affiliated Banks did not pay reasonable sweep interest rates.

42.     Thus, Defendants' cash sweeps from retirement accounts in the RASP violated the IRC, ERISA, and the contractual provisions of the Sweep Program Documents that incorporated the IRC and ERISA.

43.     In addition to its contractual obligations, as an investment advisor, Merrill owed fiduciary duties to its clients under the Advisers Act. [43]  In particular, Merrill was obligated to "serve the best interest of its client and not subordinate its client's interest to its own" and was not permitted to "place its own interests ahead of the interests of its client." [44]

44.     As its customers' agent in connection with the Sweep Programs, Merrill owed similar fiduciary duties under common law and under Regulation Best Interest, which required it to act in its retail customers' best interests and prohibited it from placing its own interests ahead of its retail customers' interests. [45]

---

[42]   29 U.S.C. §1108(b)(4).

[43]   *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019) (interpreting Section 206 of the Advisers Act, 15 U.S.C. §80b-6).

[44]   *Id.*

[45]   *See* Securities and Exchange Commission, Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318, 33320, 17 C.F.R. §240.15l-1 (July 12, 2019).

45.     However, as discussed above, Merrill violated these fiduciary duties under the Advisers Act, Regulation Best Interest, and common law by failing to act in its customers' best interests, and by placing its own interests ahead of its customers' interests, when it enriched Defendants and their Bank Affiliates by providing customers in the Sweep Programs with unreasonably low interest rates that were well below several objective benchmarks discussed above.

46.     Indeed, on January 17, 2025, the SEC announced that it had charged Merrill with "willfully" violating the Advisers Act in connection with the Sweep Programs.[46]  The SEC found that Merrill "swept billions of dollars in client cash into its [Sweep] Program annually," "earned advisory fees on [Sweep] Program assets," and "was credited with revenue from affiliated banking entities based in part on the spread earned by banking affiliates on the [Sweep] Program."[47]

47.     Despite these "significant financial benefits" to Merrill and its Bank Affiliates, "the yields advisory clients received from the [Sweep] Program were often significantly lower than the yields clients could have received had Merrill Lynch made other options available as part of the cash Sweep Programs."[48]  In particular, from January 2022 through April 2024, the disparity in yields rose as high as "almost 400 basis points" and "grew as interest rates rose."[49]

48.     As a result, the SEC concluded that, in violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder, Merrill "failed to adopt and implement reasonably designed written policies and procedures (i) to consider the best interests of clients when evaluating and

---

[46]   SEC Cease-and-Desist Order, *supra* note 11.

[47]   *Id.* at ¶7.

[48]   *Id.* at ¶2.

[49]   *Id.* at ¶¶2, 6.

selecting which cash sweep program options to make available, including during periods of rising interest rates; and (ii) concerning the duties of Merrill Lynch financial advisors in managing client cash in advisory accounts."[50]

49.    Merrill agreed to pay a civil penalty of $25 million to settle the charges and undertook "remedial acts" including increasing the rates paid to advisory clients and adopting and implementing enhanced supervisory procedures targeted at advisory client accounts with significant cash holdings.[51]

50.    In a January 17, 2025 press release announcing the charges, Sanjay Wadhwa, Acting Director of the SEC's Division of Enforcement, stated, "Cash sweep programs impact nearly all advisory clients, who often pay advisory fees on assets held in these accounts."[52] "These actions reinforce that advisory firms must have reasonably designed policies and procedures to consider their clients' best interest when evaluating potential sweep options for cash held in advisory accounts and to ensure that cash held in an advisory account is properly managed by financial advisers consistent with a client's investment profile."[53]

51.    Merrill Lynch's parent company, BofA, has also acknowledged these issues.  In July 2024, BofA added new language to its Form 10-Q stating that "the rates paid on uninvested cash in investment advisory accounts that is swept into interest-paying bank deposits" are among

---

[50]    *Id.* at ¶3.

[51]    *Id.* at ¶13; §IV.C.

[52]    U.S. Securities and Exchange Commission, *SEC Charges Pair of Wells Fargo Advisory Firms and Merrill Lynch with Compliance Failures Relating to Cash Sweep Programs* (Jan. 17, 2025), https://www.sec.gov/newsroom/press-releases/2025-16.

[53]    *Id.*

the "risks and uncertainties" that BofA investors should consider.[54]   The same language appeared in BofA's Form 10-Q issued in October 2024.[55]

**Defendants Made Material Misrepresentations and Omissions Regarding the Sweep Programs**

52.    In the Sweep Program Documents, Defendants made material omissions by failing to disclose that, as discussed above, Defendants established and used the Sweep Programs to enrich themselves and their Bank Affiliates by paying unreasonably low interest rates to customers in order to increase Defendants' and their Bank Affiliates' financial benefits from the Sweep Programs.

53.    The CR Agreement also falsely stated that "[t]he interest paid on retirement account assets ***will be at no less than a reasonable rate***"[56] when, in fact, Defendants paid unreasonable sweep interest rates on cash held in retirement accounts, as discussed above.

54.    Defendants also misleadingly stated in the RASP Documents that it was "acting as a fiduciary under Title I of [ERISA] and Section 4975 of the [IRC]" and directed customers to an IRS publication describing the rules on disqualified persons and prohibited transactions set forth in Section 4975 of the IRC.[57]   These statement was misleading and omitted material facts because,

---

[54]   Bank of America Corporation, Quarterly Report (Form 10-Q) (July 30, 2024) at 2, https://investor.bankofamerica.com/regulatory-and-other-filings/all-sec-filings/content/0000070858-24-000208/bac-20240630.htm.

[55]   Bank of America Corporation, Quarterly Report (Form 10-Q) (Oct. 29, 2024) at 2, https://investor.bankofamerica.com/regulatory-and-other-filings/quarterly-reports/content/0000070858-24-000280/0000070858-24-000280.pdf.

[56]   Merrill, *Merrill Edge Self-Directed Investing Client Relationship Agreement* (Apr. 2024), *supra* note 3 at 6.

[57]   Merrill Lynch, *Traditional IRA Disclosure Statement*, *supra* note 7 at 2-3; *see also* Merrill Lynch, *Roth Individual Retirement Account (Roth IRA)*, *supra* note 8 at 35-36.

as discussed above: (a) Defendants paid unreasonably low interest rates on cash that Defendants swept from retirement accounts and deposited into the Merrill Affiliated Banks; and (b) such deposits were prohibited transactions that were not compliance with Section 4975 of the IRC or Section 408 of ERISA.

55.     The Sweep Program Documents also misleadingly stated that "***from time to time***" the Deposit Account interest rates "will ***likely be*** lower than yields on certain money market funds and other cash alternatives"[58] and that the Deposit Account interest rates"[w]ill ***likely be*** lower than the rates available on other deposit type accounts at the Merrill Affiliated Banks and other banking institutions and yields on cash alternatives, such as money market funds."[59]

56.     Similarly, an earlier version of the Sweep Program Guide stated that interest rates "***[m]ay be higher or lower*** than the interest rates and annual percentage yield (APY) available to other depositors of the Merrill Lynch Affiliated Banks for comparable accounts or the rates of return payable on comparable arrangements offered to Merrill clients."[60]  Around December 2023, Defendants replaced "[m]ay be" with "will likely be," as quoted above.

57.     These statements were misleading and omitted material facts because, in reality, the Deposit Account interest rates were ***always*** significantly below market interest rates available on other deposit-type accounts and cash alternatives.

---

[58]   Merrill, *Best Interest Disclosure Statement*, *supra* note 2; Merrill, *Client Relationship Summary*, *supra* note 1.

[59]   Merrill, *Sweep Program Guide*, *supra* note 6.

[60]   Merrill, *Sweep     Program     Guide*     (Sept.     18,     2020), https://web.archive.org/web/20200918161917/https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/Sweep-Program.pdf.

58.    Moreover, Defendants' statements about potentially **lower** interest rates did not excuse their contractual and fiduciary obligations to pay **reasonable** interest rates, as described above.  These statements must be construed harmoniously with Defendants' contractual and fiduciary obligations.

59.    Defendants also misleadingly stated that interest rates for the Bank Deposit Program were "determined by the Merrill Affiliated Banks in their sole discretion"[61] when, as the SEC found, the Merrill Affiliated Banks set the interest rates "with input from Merrill Lynch."[62] Similarly, Defendants stated that "[i]nterest rates paid on deposits are determined at the discretion of the Merrill Affiliated Bank based on economic and business conditions"[63] when, in fact, the interest rates were jointly determined by Defendants and the Merrill Affiliated Banks and were unreasonably low at all times regardless of the economic and business conditions.

60.    Defendants also misleadingly claimed that they "adopted various policies and procedures reasonably designed to prevent the cash sweep arrangement and other business arrangements from affecting the nature of the advice we and our financial advisors provide"[64] when, in fact, as the SEC determined, Defendants failed to adopt and implement adequate policies and procedures concerning their cash sweep arrangements, in violation of the Advisers Act, and such arrangements adversely affected customers by causing Defendants to automatically sweep customer deposits into Deposit Accounts paying miniscule, below-market interest rates.

---

[61]    Merrill, *Sweep Program Guide*, *supra* note 6 at 5.

[62]    SEC Cease-and-Desist Order, *supra* note 11 at ¶2.

[63]    Merrill, *Merrill Edge Self-Directed Investing Client Relationship Agreement* (Jan. 2025), *supra* note 3 at 6.

[64]    Merrill, *Client Relationship Summary*, *supra* note 1.

**Defendants Violated the RICO Statute**

61.    Defendants violated the RICO Statute through their implementation of the Sweep Programs.

62.    Merrill and the Merrill Affiliated Banks were an "enterprise" within the meaning of the RICO Statute.  Through Merrill and the Merrill Affiliated Banks, Defendants knowingly and intentionally devised and operated the Sweep Programs as a scheme to defraud customers, including Plaintiff and the Class.  Defendants used the Sweep Programs to benefit and enrich themselves and their Bank Affiliates through, among other things, paying unreasonably low interest rates to customers on money deposited into the Sweep Programs and making false and misleading statements and omissions relating to such interest rates.

63.    The Sweep Programs involved commercial activities across state lines, including Defendants' distribution of the Sweep Program Documents to customers, and Defendants' receipt and transfer of money deposited by customers.

64.    Through the Sweep Programs, Defendants conducted and participated in a pattern of racketeering activity within the meaning of the RICO Statute ("Racketeering Acts").  Defendants' Racketeering Acts included indictable, predicate offenses under 18 U.S.C. §§1341 and 1343 based on Defendants' fraudulent use of interstate mail and wire communications.  Defendants orchestrated a scheme to intentionally defraud customers by coordinating with the Merrill Affiliated Banks to pay unreasonably low interest rates to customers in the Sweep Programs, and by concealing the scheme through false and misleading Sweep Program Documents posted on Merrill's public website and distributed to customers throughout the country.

65.    The Racketeering Acts were related in that they were taken in furtherance of Defendants' Sweep Programs scheme.  The Racketeering Acts occurred, and continue to occur, regularly and continuously over a multi-year period during the operation of the Sweep Programs.

- 22 -

66.    Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Programs scheme, including posting the materially false and misleading Sweep Program Documents on Merrill's public website and distributing them to customers throughout the country.

67.    As Sweep Programs customers, Plaintiff and the Class were damaged by Defendants' Racketeering Acts due to Defendants' payment of unreasonably low interest rates on the money customers deposited into the Sweep Programs.

### CLASS ACTION ALLEGATIONS

68.    Plaintiff brings this action against Defendants as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons who had cash deposits or balances in the Sweep Programs ("Class").  Excluded from the Class are Defendants, officers and directors of Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

69.    The Class members are so numerous that their individual joinder is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the thousands, and are geographically dispersed, because BofA oversees $3.2 trillion in client assets worldwide.

70.    Plaintiff's claims are typical of Class members' claims because Plaintiff's cash deposits were subject to the Sweep Programs, and, therefore, Plaintiff's claims, and those of all other Class members, arose from the same wrongful conduct by Defendants alleged herein.

71.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in complex class action litigation.  Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Plaintiff seeks to represent.

72.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class or a risk of adjudications that, as a practical matter, would be dispositive of the interests of other Class members who were not parties to the adjudications or would substantially impair or impede the ability of such Class members to protect their interests.

73.     Because Defendants acted or refused to act on grounds that apply generally to the Class, final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

74.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

75.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the laws as alleged herein;

(b)    whether Defendants owed fiduciary duties to Plaintiff and members of the Class in connection with the Sweep Programs;

(c)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class in connection with the Sweep Programs;

(d)    whether Defendants breached their contractual obligations to Plaintiff and members of the Class in connection with the Sweep Programs;

(e)    whether Defendants violated the Advisers Act;

(f)    whether Defendants violated the RICO Statute;

(g)    whether Defendants made material misrepresentations and/or omissions in connection with the Sweep Programs;

(h)    whether Defendants were unjustly enriched by their wrongful conduct;

(i)    whether the members of the Class sustained damages as a result of the alleged wrongful conduct by Defendants, and, if so, the appropriate measure of damages; and

(j)    whether the members of the Class are entitled to attorneys' fees and costs and, if so, the appropriate amount of attorneys' fees and costs.

### COUNT I

### BREACH OF FIDUCIARY DUTY
### AGAINST ALL DEFENDANTS

76.    Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein.

77.    Merrill was the agent of, and investment advisor to, customers enrolled in the Sweep Programs, including Plaintiff and the Class.  BofA owns and controls Merrill.

78.     Defendants owed fiduciary duties to Plaintiff and the Class, including duties to act in the best interests of, and deal fairly and honestly with, Plaintiff and the Class.

79.     Defendants violated their duty to act in the best interests of Plaintiff and the Class by using the Sweep Programs to enrich themselves at the expense of customers who were paid unreasonably low interest rates, as described above.

80.     Defendants also violated their duty to deal fairly and honestly with Plaintiff and the Class by making material misrepresentations and omissions in the Sweep Program Documents, as described above.

81.     Further, Defendants violated their duty to act with reasonable care to verify the truthfulness of the information set forth in the Sweep Programs, which were materially misleading and omitted material facts for the reasons described above.

82.     As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and the Class suffered damages and are entitled to recover such damages from Defendants.

## COUNT II

### VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940
### AGAINST ALL DEFENDANTS

83.     Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein.

84.     Merrill is registered as an investment adviser under the Advisers Act.  BofA owns and controls Merrill.

85.     For the reasons alleged herein, Merrill violated Section 206 of the Advisers Act in connection with its operation of the Sweep Programs by failing to serve the best interests of its clients and by placing its own interests ahead of the interests of its clients.  *See* Securities and

Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019).

86.     The Account Agreement should be deemed void pursuant to Section 215(b) of the Advisers Act, which provides that every

> contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

87.     Accordingly, Plaintiff seeks rescission of the Account Agreement and restitution of the consideration given pursuant to its purported terms.

## COUNT III

### BREACH OF CONTRACT
### AGAINST ALL DEFENDANTS

88.     Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein.

89.     Plaintiff and Class members were parties to the Sweep Program Documents with Merrill.  The Sweep Program Documents set forth the contractual terms and conditions of the Sweep Programs.  BofA owned and controlled Merrill.

90.     Pursuant to the Sweep Program Documents, Merrill was contractually obligated to act as agents on behalf of Plaintiff and the Class, and, thus, was contractually obligated to act in Plaintiff's and the Class' best interests in seeking and negotiating reasonable sweep interest rates under the Sweep Programs.

91.     Merrill breached its contractual obligations by failing to provide Plaintiff and the Class with reasonable interest rates on their deposits in the Sweep Programs.  Rather, the sweep interest rates provided by Merrill were below market and unreasonably low.  As such, Merrill denied Plaintiff and the Class the full benefit of their bargain under the Sweep Program Documents.

92.     As a direct and proximate result of Merrill's breach of contract, Plaintiff and the Class sustained damages.

## COUNT IV

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALL DEFENDANTS

93.     Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein.

94.     Plaintiff and Class members were parties to the Sweep Program Documents with Merrill.  The Sweep Program Documents set forth the contractual terms and conditions of the Sweep Programs.  BofA owns and controls Merrill.

95.     Implicit in the Sweep Program Documents were duties of good faith and fair dealing.

96.     Defendants breached their duties of good faith and fair dealing by failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash sweep balances in the Sweep Programs.  Rather, the interest rates provided by Defendants were below market and unreasonably low.  As such, Defendants denied Plaintiff and the Class the full benefit of their bargain under the Sweep Program Documents.

97.     As a direct and proximate result of Defendants' breaches of the implied covenants of good faith and fair dealing, Plaintiff and the Class sustained damages.

- 28 -

**COUNT V**

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. §1962(c)-(d),
AGAINST ALL DEFENDANTS**

98.    Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein.

99.    This claim arises under 18 U.S.C. §1962(c)-(d) of the RICO Statute, which provides in relevant part:

> (c)    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

> (d)    It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

100.    At all relevant times, BofA was a "person" because it was capable of holding a legal or beneficial interest in property.

101.    Merrill and the Merrill Affiliated Banks were an enterprise engaged in interstate commerce.  Through Merrill and the Merrill Affiliated Banks, Defendants knowingly and intentionally devised and operated the Sweep Programs as a scheme to defraud investors. Defendants used the Sweep Programs to enrich themselves by paying unreasonably low interest rates to Sweep Programs customers.

102.    Defendants conducted and participated in multiple, related Racketeering Acts for the purpose of implementing the Sweep Programs.  The Racketeering Acts, which occurred, and continue to occur, regularly and continuously during the operation of the Sweep Programs over a multi-year period, constitute a "pattern of racketeering activity."  The Racketeering Acts were made possible by the regular, repeated, and continuous use of the employees, facilities, and services of Merrill.

- 29 -

103.    Defendants' Racketeering Acts included the following indictable, predicate offenses:

(a)    **Mail Fraud**: Defendants violated 18 U.S.C. §1341 by sending and receiving materials via United States mail and commercial interstate carriers, including the Sweep Program Documents, for the purpose of conducting the fraudulent Sweep Programs scheme through Merrill and the Merrill Affiliated Banks.  As described above, the Sweep Program Documents contained material misrepresentations and omissions knowingly and intentionally made by Defendants for the purpose of defrauding customers.

(b)    **Wire Fraud**: Defendants violated 18 U.S.C. §1343 by transmitting and receiving writings and sounds by means of interstate wire communication for the purpose of conducting the fraudulent Sweep Programs scheme through Merrill and the Merrill Affiliated Banks.  The writings included the Sweep Program Documents, which were posted on Merrill's public website.  As described above, the Sweep Program Documents contained material misrepresentations and omissions knowingly and intentionally made by Defendants for the purpose of defrauding customers.

104.    Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Programs scheme, including mailing and transmitting the Sweep Program Documents to customers.

105.    Plaintiff and the Class suffered damages by reason of Defendants' payment of unreasonably low interest rates on their Sweep Programs deposits, in violation of 18 U.S.C. §1962(c)-(d).

- 30 -

106.    Plaintiff's and the Class' injuries were directly and proximately caused by Defendants' racketeering activity.

## COUNT VI

## NEGLIGENCE
## AGAINST ALL DEFENDANTS

107.    Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein.

108.    During the relevant time period, Merrill was the agent of customers enrolled in the Sweep Programs, including Plaintiff and the Class.  Merrill also facilitated the Sweep Programs by accepting payments from customers through its online investment platform, which were swept into the Sweep Programs.  BofA owned and controlled Merrill.

109.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Programs.

110.    Defendants' conduct with respect to the Sweep Programs, as described above, was negligent.  By failing to provide Plaintiff and the Class with fair and reasonable sweep interest rates on their cash sweep balances in the Sweep Programs, Defendants breached their duty to act with reasonable care.

111.    Defendants' negligence directly and proximately caused harm to Plaintiff and the Class.

## COUNT VII

## NEGLIGENT MISREPRESENTATIONS AND OMISSIONS
## AGAINST ALL DEFENDANTS

112.    Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein.

113.    Merrill was the agent of, and investment advisor to, customers enrolled in the Sweep Programs, including Plaintiff and the Class. BofA owns and controls Merrill.

114.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Sweep Programs.

115.    Defendants negligently made material misrepresentations and omissions in the Sweep Program Documents, as described above, which were posted on Merrill's website.

116.    Plaintiff and the proposed Class justifiably relied on Defendants' Sweep Program Documents and accordingly deposited and maintained cash balances in the Sweep Programs to their detriment.

117.    Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the proposed Class.

## COUNT VIII

### UNJUST ENRICHMENT
### AGAINST ALL DEFENDANTS

118.    Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein.

119.    Defendants financially benefited from the unlawful acts alleged herein by paying Plaintiff and the Class unreasonably low and below-market interest payments on their Sweep Programs balances. These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

120.    As a result of the unlawful acts alleged herein, Defendants were unjustly enriched at the expense of Plaintiff and the Class.

121.    Defendants have received, and are holding, funds belonging to Plaintiff and the Class, which in equity Defendants should not be permitted to keep but should be required to refund to Plaintiff and the Class.

## COUNT IX

## VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTION 349 AGAINST ALL DEFENDANTS

122.    Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein.

123.    Defendants' acts and practices with respect to the Sweep Programs, as described above, constitute unlawful, unfair, misleading, and deceptive business acts and practices in violation of §349 of New York's General Business Law ("GBL").

124.    Defendants' misleading and deceptive business acts and practices with respect to the Sweep Programs adversely impacted Plaintiff and the Class, and therefore constitute consumer-oriented conduct under GBL §349, which resulted in direct harm to Plaintiff and the Class.

125.    Accordingly, Plaintiff and the Class seek appropriate relief under GBS §349, including injunctive relief and damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for relief and judgment, as follows:

- 33 -

A.      Declaring that this action is a proper class action, certifying the Class, appointing Plaintiff as representative of the Class, and appointing Plaintiff's counsel as Class Counsel for the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the Class for all damages sustained as a result of Defendants' wrongdoing, in amounts to be proven at trial, including interest thereon;

C.      Awarding treble damages in favor of Plaintiff and the Class;

D.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

E.      Ordering rescission of the Client Agreement and restitution of all fees and other benefits received by Defendants thereunder; and

F.      Such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  February 25, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
STEPHEN R. ASTLEY
ANDREW T. REES
RENE A. GONZALEZ
SCOTT I. DION


                        *s/ Stephen R. Astley*
                  STEPHEN R. ASTLEY

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
sastley@rgrdlaw.com
arees@rgrdlaw.com
rgonzalez@rgrdlaw.com
sdion@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
MARY ELLEN CONNER
WILLIAM W. STONE
Murray House
40 Power Springs Street
Marietta, GA 30064
Telephone: 470/632-6000
michaelf@johnsonfistel.com
maryellenc@johnsonfistel.com
williams@johnsonfistel.com

*Attorneys for Plaintiff*